UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LISA BIRON | ) |
| | ) |
| V. | ) Case No. 1:16-CV-XXX-XX-XX |
| | ) |
| | ) |
| UNITED STATES OF AMERIA | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY PERSON IN FEDERAL CUSTODY

NOW COMES the Defendant/Petitioner, Lisa Biron, by and through her counsel, Wilson, Bush, Durkin & Keefe, P.C. ("the Defendant"), and hereby respectfully submits this memorandum in support of her request that this Honorable Court vacate her sentence in this matter pursuant to 28 U.S.C. § 2255 because she received ineffective assistance of counsel in violation of her rights under the Sixth Amendment to the United States Constitution. Trial counsel was constitutionally ineffective because he failed to investigate or present any mental health information related to insanity or diminished capacity when the evidence quite clearly dictated so, and this was corroborated by a psychological report offered by the Defendant during prior to sentencing. Trial counsel was further constitutionally ineffective because he failed to conduct any investigation whatsoever, whether into the government's specious witnesses or independently, while at the same time proceeding from initial appearance to trial in an unduly fast period of time that severely prejudiced the Defendant's ability to present any or even an adequate defense to these incredibly serious charges. In support thereof, the Defendant states as follows:

1

**Factual Background**

Chronological Procedural History

1.      On November 14, 2012, the grand jury sitting for the District of New Hampshire returned a seven-count indictment charging the Defendant with Transportation with Intent to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a); five counts of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a), and one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

2.      Federal law enforcement officials arrested the Defendant on November 16, 2012.  She appeared before a magistrate judge that day for an initial appearance and arraignment, and she entered pleas of not guilty to all counts.  Following the hearing, the magistrate ordered the Defendant detained pending trial.

3.      On November 21, 2012, the Court issued an order scheduling the trial for the two-week period beginning January 8, 2013.  Based upon a review of trial counsel's file, it appears the government began to send discovery materials to the Defendant's counsel beginning December 2, 2012.  It continued to send discovery to the Defendant's counsel through January 8, 2013.  Discovery in this matter exceeded 1,500 pages of material, exclusive of physical evidence and material the government did not provide but made available for counsel's review.  Of note, this included sending new and incredibly significant witnesses' statements within two weeks of trial that directly contradicted counsel's theory of defense.

4.      On January 3, 2013, the government obtained a superseding indictment from the grand jury charging the Defendant with one count of Transportation with Intent to

2

Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a), six counts of Sexual

Exploitation of Children in violation of 18 U.S.C. § 2251(a), and one count of Possession of

Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

5.      The Defendant appeared before a magistrate judge for arraignment on the new

charges on January 3, 2014.  She pled not guilty to these new charges.

6.      Five days later, and only 51 days since her initial appearance,this Court

commenced a jury trial in this matter.  The Defendant here notes that three national holidays

occurred between the Defendant's initial appearance and trial; Thanksgiving,

Christmas/Hanukkah, and New Year's Eve/Day.  Two days later, on January 10, 2014, the

jury convicted the Defendant of all counts in the superseding indictment.

7.      The Court held a sentencing hearing in this matter on May 23, 2014.  In

substance, it sentenced the Defendant to a term of 480 months in the custody of the Bureau

of Prisons.

The Trial

8.      The indictment upon which the Court tried the Defendant alleged the

following crimes in a summary form:

a.      Transportation with the Intent to Engage in Criminal Sexual Activity:

the Defendant knowingly transported R.B., who was under 18 years of age at the time, in

interstate commerce with the intent that R.B. engage in sexual activity for which any person

could be charged with a criminal offense, specifically the production of child pornography.

b.      Sexual Exploitation of Children:  the Defendant knowingly employed,

used, persuaded, induced, enticed, or coerced a minor child, R.B., to engage in sexually

3

explicit conduct for the purpose of producing a visual depiction of such conduct (six counts identifying six different videos).

      c.     Possession of Child Pornography:  the Defendant knowingly possessed child pornography on a Hewlett Packard laptop.

9.     The first witness the government called to the witness stand was a young man from Ontario Canada named Kevin Watson.[1]  He testified that he met the Defendant in March 2012 and that he met R.B., the Defendant's daughter, through a website where people can video chat with each other.  He was 19 years old at the time and talked to her about sex. This contact graduated to masturbation on Skype.  Watson testified that several weeks after this, he engaged in 'Skype sex' with the Defendant, and this behavior involved both the Defendant and her daughter on a daily basis.

10.     Watson continued that the Defendant arranged for the three of them to meet about a month after the internet interactions so that Watson could have sex with the Defendant and her daughter.  Critically, Watson testified that the Defendant told him they could make a 'porno' when they met.  Watson admitted that he knew that R.B. was only 14 years old when he eventually met her and had sex with her.  He stated that the Defendant arranged for the three of them to meet at a hotel in Canada in order to have sex, the Defendant picked him up and brought him to the hotel, and three of them smoked marijuana and drank alcohol at the hotel.  Watson admitted that he initially lied to the police when he told them there was cocaine and ecstasy in the hotel room because he was supposedly nervous when speaking with them.  According to Watson, the Defendant eventually directed

---

[1] All references to trial testimony derive from a review of the written transcript of the trial in this matter.  As well, the Defendant will focus here on the four most substantive witnesses for the government; Kevin Watson, Brandon Ore, and Robert Hardy.

him and R.B. to have sex, and she recorded a video of that on her phone.  She had also purchased condoms for the event.  Watson further stated that the Defendant video recorded him and R.B. having sex on two more occasions.  Watson concluded his direct testimony by testifying that he would not be prosecuted for any crimes if he testified truthfully at the trial.

11.    Trial counsel then cross-examined Watson.  Counsel established with Watson that nobody forced R.B. to participate in any of the subject acts he described and that R.B. wanted to engage in those acts.  Watson admitted he had sex with R.B. several times although he knew her true age (14) at the time he did so, and that the Defendant told him R.B.'s real age when she caught R.B. and Watson having 'Skype sex.'  Watson eventually admitted that the plan was for the three of them to have sex, no matter R.B.'s age or his consumption of alcohol or drugs.

12.    Watson then admitted the Canadian law enforcement authorities scared him with charges related to his activities in this case and that he lied about there being cocaine and ecstasy there after a detective had been "whaling on him" about other drugs being inside the hotel room.  He also admitted that he lied to the police when he claimed that the Defendant brought drugs to the hotel room and that she brought alcohol with her from the United States (he testified on direct that they purchased alcohol all together once they were in Canada).  Watson also admitted that, contrary to his first statement, he spoke with the prosecutors about his testimony.  Importantly, Watson admitted that the first time he ever stated that the Defendant wanted to make a 'porno' was when he met with the prosecutors three days before his testimony.  He also agreed that he discussed these events in great detail with Canadian authorities, and he never said that.  He further admitted that he only stated that in response to a specific question from the prosecutors when they met days prior to the trial.

He concluded his testimony by agreeing that he wanted to please the prosecutors in this case so he would not be prosecuted in Canada.

13.     The government then called Brandon Ore to the stand.  Ore stated that he met the Defendant in July 2012 through a personal ad on Craigslist.  He then went to the Defendant's home and had sex with her.  Ore then testified that the Defendant invited him back with a friend, he went back with his friend five or six times, the friend had sex with the Defendant and he had sex with R.B.  Ore then stated he eventually moved into the Defendant's home for approximately two months, and in August the Defendant admitted to him that she and R.B. were mother-and-daughter and that R.B. was only 14 years old.  Ore admitted that he continued to have sex with R.B. despite knowing her true age.  Ore then testified to an occasion where he claimed the Defendant suggested he and R.B. have sex on a couch in the living room, and she filmed them doing that with her phone.  The Defendant did not tell them she was going to film this event.

14.     Ore continued by stating that the Defendant showed him a video of R.B.'s first time having sex, and that the Defendant stated it was her plan to go to Canada, meet Kevin, have sex, and that she wanted to film it.  He also stated that a man named Rob Hardy moved into the home during the summer of 2012; he had arrived at a party at the house and never left.

15.     Trial counsel's cross-examination of Ore established two points:  1) he did not know if there was any plan to make a video involving R.B. and Watson.; and 2) nobody forced R.B. to have sex with him, it appeared to him that she wanted do so.

16.     The government then called its third civilian witness, Rob Hardy.  Hardy testified that he met the Defendant and R.B. at a party at the Defendant's house with various

guys that went until 2:00 or 3:00 a.m.  He had sex with the Defendant that night and proceeded to move into the home.  He testified that the Defendant, for some reason, told him that she wanted to record R.B. losing her virginity in Canada.  He finished his direct testimony by telling the jury that he was a gang member in the Crips.

17.     On cross-examination, trial counsel established that the gang in which Hardy was a member engaged in drug trafficking and violence.  He then established that an F.B.I. agent contacted Hardy on December 7, 2012, and Hardy refused to speak with him. However, on December 26, 2012, Hardy called the agent to arrange a meeting.  During that meeting, he told the agent he was a member of the Crips since he was 12 years old, he committed crimes involving drugs and violence, and he had stayed at the Defendant's home for about a month.  Trial counsel was able to get Hardy to admit that the Defendant stated she had recorded R.B. losing her virginity in Canada and not that she intended to do that when they went there.

18.     The government then called its last civilian witness, Lisa Brien.  Brien testified that she knew the Defendant for at least 12 years and that they met through church.  They had the same mentor at the church and were in a home-based church group together.  Over the years they grew close to each other, socialized with each other and their families, and their kids played together.  In July of 2011, the Defendant's husband left her for the second time.  Brien and the Defendant had been in constant and regular contact up to that point, but then the Defendant did not contact Brien after that until October 2012.  The Defendant informed Brien she had been arrested.  The Defendant also told her that R.B. wanted to have her first sexual experience recorded.  The Defendant told Brien that she and R.B. loved Watson.

19.     On cross-examination, Brien admitted that everything seemed normal with the Defendant at the July 2011 barbeque.  According to Brien, the Defendant's husband told her he was leaving because he wanted to do drugs more than he wanted to be a father.  She also testified that he had left previous to this under similar circumstances.  Brien then testified that she and the Defendant maintained contact after July 2011 through phone calls and texts, but that the Defendant stopped contacting her in approximately February 2012.

20.     The government then called a series of witnesses to admit the physical evidence to include the videos, pictures, laptop, and jail-call recordings.

21.     In his closing argument, trial counsel focused his argument on the government's burden of proof.  Regarding count one, he argued that the government did not prove that the Defendant had the intent to make a video when she brought R.B. to Canada. Specifically, he argued Ore said he never heard of any plan to make a video regarding Canada, despite his testimony to this on direct examination.  However, Ore did admit on cross-examination that he did not hear of any such plan.  He pointed out that Watson only said such a plan existed days before the trial when specifically asked by the prosecutors, shrouded by his cooperation agreement.  Regarding Hardy, he argued that something suspicious went on with his testimony as he was a gang member who voluntarily contacted the F.B.I. after telling them he did not want to talk to them.  Finally, about Brien, counsel pointed out that the Defendant never said she went to Canada to make a video.

22.     Regarding counts two through seven, counsel argued that the government did not offer any evidence to demonstrate that the Defendant did anything to cause R.B. to engage in the subject acts.  He argued that R.B. engaged in all of this conduct voluntarily and

the government did not offer any evidence that the Defendant did anything to cause R.B. to engage in these voluntary acts.

23.     Counsel then discussed the Defendant's decompensation over time.  He argued that something happened to the Defendant during the time after her husband left and she lost contact with Brien.  He stated, "She went down this hole, this deep, deep hole, and she brought her daughter with her."  He followed this up by saying he was not offering that as a justification or excuse, but to point out that they were talking about human beings.

## **Legal Argument**

### The Applicable Law

24.     28 U.S.C. § 2255 provides:

> A prisoner in custody under a sentence of a court established by
> an Act of Congress claiming the right be released upon the
> ground that the sentence was imposed in violation of the laws of
> the United States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the
> sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  The Defendant here asserts that the sentence here was imposed in violation of the United States because her trial counsel was constitutionally ineffective in violation of the Defendant's rights given to her through the Sixth Amendment to the United States Constitution.

25.     To prevail upon a claim of ineffective assistance of counsel, a petitioner must "show by a preponderance of the evidence, that [her] trial counsel's conduct fell below the standard of reasonably effective assistance and that counsel's errors prejudiced the defense." Gonazlez-Soberal v. United States, 244 F.3d 273, 277 (1st Cir. 2001) (citing Strickland v.

<u>Washington</u>, 466 U.S. 668, 687 (1984)); <u>Cofske v. United States</u>, 290 F.3d 437 (1st Cir.

2002).  A convicted defendant's claim that counsel's assistance was so defective as to require

reversal of a conviction has two components, the first one being that the defendant must

show that counsel's performance was deficient.  <u>Stickland</u>, 466 U.S. at 687.  This requires

showing that counsel's errors were such that he was not functioning as the "counsel"

guaranteed by the Sixth Amendment to the United States Constitution.  The second

component, regarding prejudice, requires showing that counsel's errors were such that the

defendant did not receive a fair trial, a trial whose result is reliable.  <u>Id</u>.

26.     The Sixth Amendment right to a fair trial mandates that it is one in which

evidence subject to adversarial testing is presented to an impartial tribunal for resolution of

issues defined in advance of the proceeding.  <u>Id</u>. at 685.  The right to counsel plays a crucial

role in the adversarial system embodied in the Sixth Amendment, since access to counsel's

skill and knowledge is necessary to accord defendants the "ample opportunity to meet the

case of the prosecution" to which they are entitled.  <u>Id</u>. (quoting <u>Adams v. United States ex</u>

<u>rel. McCann</u>, 317 U.S. 269, 275-76 (1942)).  The Sixth Amendment recognizes that counsel

must play a role that is critical to the ability of the adversarial system to produce a just result.

<u>Id</u>.

27.     Regarding the first component of a claim of ineffective assistance of counsel,

representation of a criminal defendant thus entails certain basic duties.  <u>Id</u>. at 688.  Counsel's

function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty

to avoid conflicts of interests.  <u>Id</u>.  From counsel's function as assistant to the defendant

derive the overarching duty to advocate the defendant's cause and the more particular duties

to consult with the defendant on important decisions and to keep the defendant informed of

10

important developments in the course of the prosecution.  Id.  Most importantly, counsel has

the duty to bring to bear such skill and knowledge as will render the trial a reliable

adversarial testing process.  Id. (citing Powell v. Alabama, 287 U.S. 45, 68-69 (1932)).

28.     The central question regarding the first component is whether counsel's

performance was reasonable considering all the circumstances.  Id.  A court deciding an

actual ineffective claim just judge the reasonableness of counsel's challenged conduct on the

facts of the particular case, viewed as of the time of counsel's conduct.  Strickland, 466 U.S.

at 690.  A defendant making such a claim establishes deficient performance by identifying

the acts or omissions of counsel that were not the result of reasonable professional judgment.

Id.  A reviewing court must then determine whether under the circumstance of the case the

identified acts or omissions were outside the range of professionally competent assistance.

Id.  Such a court must keep in mind that counsel's function, as elaborated in prevailing

norms, is to make the adversarial testing process work in the particular case.  Id.  Especially

important here, "counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigation unnecessary."  Id. at 691.  In any

ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances.  Id.

29.     Regarding the second component of an ineffective claim, the purpose of the

Sixth Amendment guarantee to counsel is to ensure that a defendant has the assistance

necessary to justify reliance on the outcome of the proceeding.  Strickland, 466 U.S. at 691-

92.  As such, any deficiencies in counsel's performance must be prejudicial to the defendant

in order to constitute ineffective assistance of counsel.  Id. at 692.  Importantly, a defendant

need not show that counsel's deficient conduct more likely than not altered the outcome of

the case.  Id. at 693.  This is because "[t]he results of a proceeding can be rendered

unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be

shown by a preponderance of the evidence to have determined the outcome."  Id. at 694.  As

such, a defendant need only show a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  Id.  Moreover,

and crucial to any analysis here, a verdict only weakly supported by the record is more likely

to have been affected by errors than one with overwhelming record support.  Id. at 696.

   <u>Failure to Investigate Mental Health</u>

   30.     The Defendant's first claim of ineffective assistance of counsel is that trial

counsel failed to investigate, or present, any mental health-related evidence or defense.

Specifically, trial counsel did not investigate either an insanity or diminished capacity

defense.  This error was not made with reasonable professional judgment, and it was outside

the range of professionally reasonable and competent assistance of counsel.  As well, given

the allegations and documentary evidence, and the state of the record regarding the

Defendant's intent relating to the most serious allegations, this error was such that it

establishes a reasonable probability that the results would have been different if counsel

pursued this line of investigation.

   31.     18 U.S.C. § 17 provides that it is an affirmative defense to a prosecution under

any federal statute that at the time of the of the commission of the acts constituting the

offense, the defendant, as a result of a severe mental health disease or defect was unable to

appreciate the nature and quality or the wrongfulness of her acts.  18 U.S.C. § 17(a).  A

defendant need only prove this defense by clear and convincing evidence.  18 U.S.C. § 17(b).

As well, the defense of diminished capacity negates the *mens rea* in specific intent crimes.

United States v. Williams, 630 F.3d 44, 49 (1st Cir. 2010); Mallett v. United States, 334 F.3d 491, 495 (6th Cir. 2003) ('diminished capacity' defense is directly concerned with whether the defendant possessed the culpable mental state for the commission of the crime, and it is available to negate the *mens rea* of a specific intent crime).  Trial counsel should have at least investigated these potential defenses in this matter based simply upon the uncontroverted depraved actions of the Defendant as evidenced in this matter and that there was a clear dividing line separating the Defendant who participated in such horrendous acts with her daughter  and a woman who was the picture of societal progress and achievement. That dividing line was her husband leaving her for the second time.  Counsel should have at least investigated, and presented some mental evidence of, who the Defendant was prior to her husband leaving her for the second time and the person she became after that event.  One who hears the evidence in this case, and learns that the Defendant was a responsible and driven woman, and caring mother, must simply shake his or head and wonder what happened to this woman to allow her to engage in such insane acts.  Trial counsel never investigated such evidence prior to trial, although he was aware of it through speaking with the Defendant and reading the discovery.[2]  As such, the jury never heard about how and why the Defendant decompensated into such a state as to allow such things to happen.

32.     The First Circuit has emphasized that trial counsel is bound to investigate a mental-health defense when there is sufficient reason to investigate, and that failing to do so will result in constitutionally deficient representation.  Mello v. DiPaulo, 295 F.3d 137, 146 (1st Cir. 2002) (counsel's reliance on denial of specific intent was a "thin reed" on which to

---

[2] The Defendant will submit an affidavit in support of this motion as described in the Defendant's Assented-to Motion to Stay this matter.

base a defense, and trial counsel should have investigated his client's mental health because there were reasons to do so).  As well, another court has stated that "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition … without a supporting strategic reason, constitutes deficient performance."  Hoffman v. Arave, 455 F.3d 926, 932 (9th Cir. 2006).  The reviewing court there focused upon the Defendant's illogical explanation for his acts, and that should have indicated to counsel that the Defendant was not entirely well.  Id. at 933.  In such a situation, counsel has an "absolute duty to make reasonable investigations or to make a reasonable decision that made investigations unnecessary."  Id. (quoting Strickland, 466 U.S. at 668, 691).  Such a failure where the record does not reflect a calculated decision to pursue the defense cannot stand, and this is especially true of a mental-health defense would be consistent with the defense proffered at trial.  Id. at 933-934.

33.     Here, one must begin the substance of the allegations themselves, and one is then required to wonder and inquire about the Defendant's mental health at the time she allegedly committed the offenses.  The record reflects the following abhorrent, disturbing, and disgusting behavior by the Defendant that demonstrated no regard for the health or safety of her daughter and reflects a complete abandonment of rational and reasonable thought and behavior previously exhibited by the Defendant:  she engaged in online sex with her 14-year-old daughter and a man; she brought her daughter to Canada in order to have sex with this man; while there she consumed alcohol and marijuana with her daughter; she watched her daughter engage in sex with this man; she video recorded these acts; she engaged in sexual acts with this man herself; she placed an online advertisement soliciting men to come her home with her daughter; she invited men into her home in order to have sex with her

daughter; the house became a non-stop drug and sex party; she allowed her daughter to consume alcohol and use drugs in her home; she used drugs and engaged in sexual acts with her daughter; she allowed and encouraged her 14-year-old daughter to have sex with multiple partners; she video recorded her daughter having sex in her home; and quite simply, she entirely abandoned her role as the victim's mother but instead allowed her daughter to participate in a pornographic and incredibly dangerous lifestyle.  These acts, by the shear insanity of them, speak to the Defendant's mental state when she committed them, and they raise the obvious question of whether the Defendant understood the wrongfulness of her actions involving her daughter and/or whether she was suffering from some mental or emotional condition that contributed to her actions in this regard.  There are two questions one must reasonably ask when he or she hears the evidence in this case.  How could she let this happen?   What happened to her to allow this to happen?

34.     Juxtaposed to this is the mother and person the Defendant was prior to her husband leaving her for the second time.  She put herself through college and law school, passed the bar, and obtained full-time employment as a lawyer.[3]  She was incredibly active in her church, socializing and befriending members of that church.  She was raising her daughter as one would hope and expect of a mother.  She spent much of this time as a single mother because her husband had left her for a period of time because he wanted to use drugs. When her husband returned approximately one year later after completing a rehabilitation, he obtained a job that had him away from home about half the time.  She was, for the most part, again a single mother again.  This pattern continued until the summer of 2011 when her

---

[3] This information, and that which was follows here, was presented to the trial court by way of a letter written by Dr. Thomas Burns that was contained within the Defendant's sentencing material submitted to the Court.  It will be submitted as an exhibit in support of this motion.

husband left her, again, to be a drug addict.  As the Defendant told the psychologist who interviewed her prior to her sentencing, her world collapsed because of this.  He left her heavily in debt with a child, and she struggled to survive.

35.    The Defendant then began to consume alcohol on a heavy basis and eventually began using marijuana to cope with the stress of her life.  She also began to abuse the prescription drug Ativan.  This fall into substance abuse coincided with her daughter's growing sexual awareness.  The stress of her life and accompanying substance abuse caused her to be fired from her employment as a lawyer in November 2011.  The slow personal collapse continued, and it was exacerbated by the growing financial ruin in which she found herself.  She hid this personal downfall from her friends.  One evening, the Defendant consumed alcohol with her 13-year-old daughter and they both became drunk.  They then drank and used drugs together.  Around this time, as well, the Defendant discovered her daughter had been cutting herself.  Also, the Defendant's drinking continued in an abusive fashion, and she became dangerously promiscuous.  She even believed her 14-year-old daughter was jealous of a man whom she was seeing.  It was soon after this that she discovered her daughter was in contact with Kevin Watson and was engaging in online sex with him.  The acts that make up the allegations in this matter soon followed.  The Defendant told the psychologist who interviewed her prior to sentencing that it seemed okay to her to be sexting this man with her daughter.  In describing why she made the subject videos, the Defendant admitted that she was in such a mental state during this time period that she could not 'intend' to do anything as it her entire life had become a series of spontaneous sex-and-drug-induced adventures that included her and her daughter having sexual relations with multiple men, drinking and using drugs, and posting online ads for men.  However, these

activities became so dangerous that the Defendant had to sleep with a handgun nearby due to the danger of all the men coming into the home.

36.     The juxtaposition of Lisa Biron before her husband left the second and the Lisa Biron who committed the acts here are clearly two different people.  As Dr. Thomas Burns noted in his evaluation of Lisa, her behavior in 2012 seems simply incredible.  Dr. Burns described her prior to her husband's leaving as the picture of conventionality and prosocial achievement. Then, as Dr. Burns wrote, the events of late 2011 and 2012 that read like a bad pornographic novel.  She put herself and her daughter in dangerous situations and even armed herself for protection, she abandoned work and lived for the moment, and she stopped being a mother but degenerated into a 'Thelma and Louise' relationship with her daughter.  More importantly, Dr. Burns referred to this downward spiral as a "collapse."  Dr. Burns attributed this collapse to losing her husband, increased financial pressure, career stressors that overwhelmed her due to the first two factors, increased drinking, mounting worries about career and finances, and growing isolation and alienation from her Christian group contributed to a "synergistic meltdown."  The doctor stated that during this time she stopped functioning as an adult but more so as a hedonistic adolescent who had given up on being an adult.  He described her as having little self-efficacy (being fairly acute), significantly depressed, having significant alcohol and drug dependence, showing a reliance upon others to make decisions for her, and someone who lets others take advantage of her.

37.     Most importantly, although Dr. Burns did not conduct his evaluation until after the trial of this matter, trial counsel was aware of all the facts that led to Dr. Burns' conclusion, and he knew or should have known that something was wrong with the Defendant worth investigating and presenting to a jury.  Not only had the Defendant

17

explained to him how she had come to the point in her life where she committed the acts alleged here, but counsel knew that she had gone through some kind of mental or emotional collapse that led to these events.  Counsel discussed the Defendant's decompensation over time in his closing argument.  He argued that something happened to the Defendant during the time after her husband left and she lost contact with Brien.  He stated, "She went down this hole, this deep, deep hole, and she brought her daughter with her."  Despite knowing full well that the Defendant had gone "down this hole, this dep, deep hole, and brought her daughter with her," trial counsel did not once investigate either a defense of insanity or diminished capacity.

38.     This failure to do so, in the face of the Defendant's stated history and the before-and-after person she presented, does not fall within the range of professionally competent assistance of counsel.  "In certain instances when there is evidence in the record that shows that counsel had reason to know, from an objective standpoint, that a possible defense such as insanity was available, failure to investigate fully can constitute ineffective assistance of counsel."  Brown v. Sternes, 304 F.3d 677, 692 (7th Cir. 2002).  Counsel was well aware of this collapse, yet he chose not to investigate any possible insanity or diminished capacity defense.  This failure satisfies the first prong of an ineffective claim.  Trial counsel had sufficient information discussed above to be on notice that there existed a mental health defense, he referenced it in his closing argument, yet he failed to make any investigative efforts toward it.

39.     As to the prejudice here, there is a reasonable probability that if trial counsel had conducted a mental health investigation and offered a mental health defense, the result of the proceeding would have been different.   An insanity defense would have perfectly suited

the offered defense here; that the Defendant did not appreciate that nature and quality of the wrongfulness or her acts; or that due to her diminished capacity she did not possess the requisite mental state for the most serious charges.  Counsel could have offered the testimony and opinion of someone like Dr. Burns, and that would have explained to the jury how someone could do something so horrific with and to her own teenage daughter, the collapse experienced by the Defendant and the factors that led to it, and this would have explained to the jury how a mother could become such a monster.[4]  It would have explained to the jury how this woman who was a loving mother that was heavily involved in her church and put herself through college and law school became such a monster.  But the jury did not hear any of that, and they did not hear from any professional or expert to offer any evidence in support of any mental health defense.  All they saw was a woman who engaged in a lifestyle with her 14-year-old daughter that was made up of sex, drugs, alcohol, and the threat of strange men.

40.     This error is exacerbated in light of the tenuous nature of the government's case regarding the most serious charges.  A verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Strickland, 466 U.S. at 696.  The government had to prove that the Defendant went to Canada with the victim in order to make a pornographic video, and it needed to prove that the Defendant employed, used, persuaded, induced, or enticed the victim to engage in sex for the purpose of producing a visual depiction of that conduct.

---

[4] Although Dr. Burns did not offer a specific mental health diagnosis, it does not appear that he was asked to do so. Additionally, based upon current counsel's investigation, a psychiatrist (as opposed to a psychologist) would have been a more appropriate person to evaluate the Defendant.  Additional mental health material may be offered in this matter.

41.     Here, the evidence that the Defendant went to Canada with the intent to make a pornographic video was weak.  Kevin Watson testified that the Defendant intended to record the victim having sex with him prior to coming to Canada, but he soon admitted he was scared by Canadian law enforcement authorities for his activities with the victim, he wanted to keep the federal prosecutors in this case happy, he had never said anything about the Defendant's intention of making a video to Canadian authorities, and he only said three days before trial when specifically asked by the federal prosecutors.  Thus, Watson's testimony was quite clearly called into question.  As well, the only other witness who offered similar evidence was Lisa Brien, who testified the Defendant told her the victim wanted her first sexual experience recorded.  However, the government offered no evidence as to when the victim allegedly stated this, and there was no evidence that the Defendant herself wished to record this event.  As such, the evidence in support of count one of the indictment was specious at best, and this exacerbated trial counsel's error for failing to investigate a mental health defense.

42.     Such a defense would have had a reasonable probability of changing the outcome of the case by allowing the jury to understand that the Defendant likely did not appreciate the wrongfulness of her actions or was not able to form the specific intent applicable to commit the crime alleged in count one.  It also would have blended well with counsel's defenses surrounding intent and causing the victim to engage in sexual acts for the purpose of recording them.

43.     As well, regarding counts two through seven in this case, the evidence in the entire trial established that the victim voluntarily participated in all the events at issue in the case.  Nobody forced her, and the Defendant merely participated in these events with her

daughter.  The only evidence in this regard came close to satisfying this count was one event described by Brandon Ore where he stated that the Defendant suggested he and the victim have sex in the living room, and the Defendant began recording that act without stating it was her intention to do so beforehand.  This evidence does not establish that the Defendant anything to cause the victim to participate in that act, only Ore, and Ore's credibility was called into question during the trial.  The record establishes that the government was able to prove beyond a reasonable doubt that the Defendant was a horrible mother, and did horrible things, but specific to the elements of the most serious crimes, the government's evidence was thin.  This exacerbated trial counsel's failure to pursue a mental health investigation because it increases the probability of affecting the result of this case.  For all of these reasons, the Defendant received constitutionally deficient ineffective assistance of counsel in violation of her rights under the Sixth Amendment to the United States Constitution.

Rushing to Trial/Failing to Investigate

44.      Trial counsel as well provided constitutionally deficient ineffective assistance of counsel by rushing to trial such that he could not be properly prepared and failing to investigate any of the government's witnesses or conducting his own investigation.  This error was not made with reasonable professional judgment, and it was outside the range of professionally reasonable and competent assistance of counsel.  In light of the allegations and documentary evidence, and the state of the record regarding the Defendant's intent relating to the most serious allegations – the specious and changing testimony of Kevin Watson and Brandon Ore, this error was such that it establishes a reasonable probability that the results would have been different if counsel pursued any line of investigation regarding these

witnesses.[5]  These witnesses were under the weight of needing to keep prosecutor's satisfied with their testimony such that they would not face criminal prosecution of their own, and they each changed their statements in the days leading up to the trial.

45.     Under *Strickland,* this Court must first determine whether trial counsel's performance fell below an "objective standard of reasonableness." Strickland, 466 U.S. at 688.  Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691.  The Ninth Circuit Court of Appeals has (as recognized in a decision issued by the First Circuit Court of Appeals, *Horton v. Allen*, 370 F.3d 75, 87 (1st Cir. 2004)) held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." Avila v. Galaza, 297 F.3d 911, 919 (9th Cir. 2002) (quoting Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)); see also Lord v. Wood, 184 F.3d 1083, 1096 (9th Cir. 1999) (counsel's performance was deficient where counsel failed to interview three witnesses who had material evidence as to their client's innocence).  Of course, counsel need not interview every possible witness to have performed proficiently. LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998) (concluding there was no prejudice where trial counsel had personally interviewed the one eyewitness and read investigative reports and transcripts of interviews with all other witnesses).  "However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than

---

[5] As discussed in the Defendant's Assented-to Motion to Stay this matter such that she can conduct a proper investigation through counsel, an investigator will investigate these witnesses, to include allowing counsel to finally obtain complete discovery in this matter, the factual record in support of this portion of the Defendant's motion will be further developed at a later date.

if he interviews the witness.  The reason for this is simple: A lawyer who interviews the

witness can rely on his assessment of their articulateness and demeanor - factors we are not

in a position to second-guess."  Lord, 184 F.3d at 1095 n. 8 (parenthetical in original).

46.     Here, it appears from the chronological procedural history that it was one of

trial counsel's strategy to rush to trial in an effort to prevent the government sufficient time

to prepare for trial and arrange for the government to have Kevin Watson come from Canada

to testify against the Defendant.[6]  The concomitant strategy put to work with this appears to

have been to put the government to its burden of proof and argue through impeachment of

the government's witnesses that the government did not prove beyond a reasonable doubt

that the Defendant went to Canada with the intent to video record her daughter having sex

(count one of the superseding indictment) and that she in any way caused the victim to

engage in any sexual acts for the purpose of creating a visual depiction of those acts (counts

two through seven of the superseding indictment).  It is the Defendant's understanding that

trial counsel based this strategy, at least partially, on the fact that the government did not

produce any evidence of intent (for all but the child pornography charges) on the Defendant's

part in its original production of discovery materials to support the allegations contained in

counts one through seven of the original indictment (which was identical to the superseding

indictment but for changing the description of the victim and adding one exploitation

charge).[7]

---

[6] Undersigned counsel attempted to speak to trial counsel about his representation of the Defendant, but in response he stated that he would rather testify at a hearing.
[7] The Defendant will submit an affidavit in support of this motion as described in her Assented-to Motion to Stay this matter.

47.     This strategy of rushing to trial, challenging intent, and arguing burden of proof in this case was a high-wire act that was likely bound to fail from the inception, but became futile in the days and weeks preceding trial.  Initially, the evidence in this case was more disturbing than can be adequately described in words.  A reasonable person cannot fathom how someone would do the things that the jury heard and saw in this case.  Quite simply, putting aside the specific legal principles involving intent and cause, the evidence in this case and the portrayal of the Defendant to the jury was such that the emotional impact upon the jury would have left them with the unquenchable desire to convict the Defendant and see her punished for what happened in this matter.  No matter whether the government proved intent as it related to count one and cause as it related to counts two through seven, the government did not truly have the burden of proof in that courtroom during this trial. The Defendant's actions were so heinous that it was the Defendant who somehow had to convince the jury beyond all doubt that she was not guilty.  She could not prove that she had not participated in these activities with her daughter, so her only hope of a true defense would have been to try and explain to the jury why and how these things could have happened through a mental health defense or other witnesses, and then she could have some hope to rely upon a defense focused around intent and cause.  Importantly for this portion of her argument, any true hope of that defense would have necessarily involved investigating and interviewing the government's witnesses in order to obtain new and/or impeachment information, and as well conducting an independent investigation.  Counsel failed to do those things, and as such the Defendant had no hope of securing a not guilty verdict in the manner counsel proceeded to trial.[8]

---

[8] Undersigned counsel still has not been able to obtain complete discovery in the underlying matter.  He hopes to do

48.     Importantly here, the government provided the bulk of its discovery in this matter, as revealed by trial counsel's file, on or after December 26, 2012, with the trial beginning on January 8, 2013.  This left counsel, at most, only 12 days to absorb the bulk of the government's discovery, assess the legal and factual issues in the case, put together a trial strategy and plan, and then prepare for trial.  Such a situation was revealed when trial counsel objected to the government's list of proposed exhibits regarding recorded jail calls involving the Defendant.  He stated he received the list on January 3, 2013, and as of January 7, 2013, "he has had little time to digest the list."  This is clearly indicative of the fact that counsel did not have sufficient time to prepare for a trial where the Defendant faced decades in prison.

49.     Simply on its face, a trial strategy of proceeding to such a significant trial with such emotionally damning evidence in such a short period of time is clearly constitutionally ineffective.  This is especially true when trial counsel failed to conduct any investigation of the government's key witnesses, nor did he conduct any additional investigation on his own.  Such representation falls below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's errors, the proceeding would have been different.[9]

50.     Keeping in mind the specific language in *Strickland* regarding counsel's duty to investigate, the case of *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005) is instructive here.  In that case, the state charged the defendant with arson.  After exhausting his state court remedies, the defendant brought a federal habeas petition alleging ineffective assistance for counsel's failure to conduct his own investigation into the alleged arson, specifically for

---

so soon such that he can work with an investigator.
[9] The prejudice prong of this analysis will be more fully developed after current counsel has had the opportunity to properly investigate this matter as described in the Defendant's Assented-to Motion to Stay this matter.

failing to employ an expert witness.  Although the Defendant here does not allege counsel was ineffective for only failing to employ an expert witness (she does so regarding the mental health evidence), the principles upon which the First Circuit found that counsel's representation fell below the required standard are applicable here.

51.     The Court began its analysis by noting that trial counsel there, like here, was experienced.  Dugas, 428 F.3d at 328.  However, the relevant inquiry is whether trial counsel's performance, given the particular facts of the case, fell below the constitutional standard of competence by inadequately investigating a defense that he used in his overall strategy.  Id.  The true inquiry here is whether trial counsel's investigation of his purported defense was reasonable.  Id. (citing Wiggins v. Smith, 539 U.S. 510, 523 (2003)).  What is different here, and more aggravating to the Defendant's cause, is the hurried manner in which trial counsel proceeded to trial such that he was incredibly rushed to prepare a defense in this matter in addition to failing to investigate anything.

52.     In *Dugas*, the Court noted that trial counsel's investigation amounted to looking at the state's evidence and speaking with other defense counsel.  The Court found that trial counsel there "abandoned his investigation … after having acquired only a rudimentary knowledge of the issues from a narrow set of sources."  Id.  The same is true here.  Although reasonably diligent counsel may draw a line where they have good reason to think further investigation would be a waste, counsel's failure to investigate material he knew that the prosecution would rely on was ineffective.  Rompilla v. Beard, 545 U.S. 374 (2005).  Counsel's base of knowledge came from the government's discovery and his client. He did nothing to follow up on anything in the government's discovery, nor did he conduct any investigation based upon his consultations with the Defendant.

53.     The First Circuit found multiple reasons why trial counsel's failure to thoroughly investigate his defense was constitutionally deficient, and most, if not all, of those reasons equally apply here.  First, the Court there found that challenging the state's case was critical to his defense, and other than creating reasonable doubt that the fire was not arson, the defendant's only other defense (that someone else did it) is a difficult one to proffer.  Id. at 329.  Here, the same holds true.  Challenging the government's case, specifically Kevin Watson and Brandon Ore, was critical to the Defendant's case.  Both witnesses changed their statements in the days and weeks leading up to the trial.  As well, the Defendant's only other defense - the government failed to meet its burden of proof - was an incredibly difficult one to offer due to the horrific nature of the evidence in this case.  Much of trial counsel's defense depended on his ability to show the jury that the Defendant did not have any intent to make a pornographic video involving her daughter when she went to Canada, and that she did not in any way cause the victim to engage in sexual acts for the purpose of recording them.  Watson and Ore were the central witnesses in support of this evidence, and tangential witnesses included Hardy and Brien.  Trial counsel investigated none of them, nor did he attempt to interview any of them or anyone else who could have potentially had relevant information.

54.     The second reason offered in *Dugas* was that the arson evidence was the cornerstone of the state's case.  Id.  The Court there emphasized the state had little evidence beyond that.  Here, as discussed above relative to the intent and cause issues, Watson and Ore were the central pieces of evidence.  Just as the First Circuit stated in *Dugas*, "it is unfathomable that he did not undertake a more thorough investigation into such a crucial aspect of the defense."  Id.

27

55.     Another reason offered by the First Circuit was that the jury was likely to view the scene as an arson.  Id. at 330.  Here, a similar hurdle existed in that trial counsel had to address the fact that the images and allegations were so horrible that a jury would likely see the Defendant as guilty from simply engaging in such behavior with her daughter, without regard to specific elements of the crime charged.  Again, the Defendant's purported behavior was such that a jury would want to convict her without regard to the government's burden of proof and the specific elements of the crimes charged.

56.     Another reason offered by the First Circuit was that trial counsel had at least some reason to believe that there were problems with the state's case.  Id.  "In assessing the reasonableness of an attorney's investigation … a court must consider … whether the known evidence would lead a reasonable attorney to investigate further….  *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision…."  Id. (quoting Wiggins, 539 U.S. at 527).  Here, the government's intent and cause evidence offered through Watson and Ore was specious in that each changed their statements in the weeks prior to trial and only after being specifically asked by the federal prosecutors, prosecutors they had to keep happy.  Further investigation into them was more than warranted.

57.     Taken together, these circumstances demonstrate the inescapable need for an investigation into the government's witnesses as well as possibly other witnesses who may have been able to offer contrary evidence.  This Court cannot conclude that rushing into such a significant trial without investigating key government witnesses or conducting his own independent investigation could be justified by any reasonable or rational tactical decision.  "A tactical decision to pursue one defense does not excuse failure to present another defense

that 'would bolster rather than detract from the primary defense.'" Id. at 331 (quoting Foster, 9 F.3d at 726). Relying solely upon cross-examination is sufficient only where the state's case is so weak that it can be "demolished on cross-examination," or where the defense has built a cross-examination upon its own investigation. Id. (citing Ruiz v. United States, 221 F.Supp.2d 66, 82 (D. Mass. 2002); Miller, 255 F.3d at 459). Neither situation was present here. As such relying solely upon cross-examination without any investigation was constitutionally deficient.

58.     These failures by trial counsel prejudiced the Defendant because there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different.[10] In this regard, "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced." When a case is close, and would not have taken much to sway at least some jurors toward acquittal, like the case, the threshold for prejudice is comparatively low because less would be needed to unsettle a rational jury. Dugas, 428 F.3d at 336 (citing Strickland, 466 U.S. at 696).

59.     Here, the government offered evidence regarding count one of the superseding indictment by three specious witness; Watson, Ore, and Brien. Watson and Ore both changed their statements in the days leading up to trial, and Brien only stated that it was the victim who wanted her first sexual experience recorded. Also, of note regarding Brien, the government provided trial counsel with a letter from Brien's doctor advising that she suffered from depression, was an emotional liability, and was not a candidate for the witness

---

[10] Again, undersigned counsel notes that this portion of the Defendant's motion will be supplemented during the period this matter is stayed due to the reasons stated in the accompanying Assented-to Motion to Stay.

stand due to the exacerbation of her condition.  There was also evidence in the government's

discovery that Brien was prescribed medications for her illness.  Trial counsel did not

question her about these issues.  The only witnesses to testify regarding the sexual acts and

recording of them were Watson, Ore, and Hardy.  Again, all three testified that the victim

voluntarily participated in all of the activities that were recorded and that the Defendant did

not force or cause her to engage in those activities.  But for the horrific nature of the

evidence in this case that did not go to the contested elements of the case, a rational jury had

very little evidence upon which to convict the Defendant of counts one through seven of the

superseding indictment.

60.    Any additional evidence, evidence to further impeach these witnesses,

evidence to contradict these witnesses, additional witnesses to accomplish these goals would

have probably changed the outcome of this trial.  This is especially true if trial counsel had

investigated and pursued any mental-health evidence and defense to give the jury some

explanation as to how the Defendant could have decompensated into such a state in her life

with her daughter.  Trial counsel's failure to do so, to be more fully addressed in a

supplemental pleading, quite clearly prejudiced the Defendant.  Trial counsel's strategy to

run to trial in the hopes of catching the government off guard, while he had to process more

than 1,500 pages of discovery materials and put together a trial strategy and plan in a mere

matter of weeks without conducting any mental health or fact investigation was

constitutionally deficient.  Although with the best of intentions and great experience, counsel

provided ineffective assistance of counsel in violation of the Defendant's Sixth Amendment

rights.

WHEREFORE, the Defendant, Lisa Biron, respectfully requests that this Honorable

Court:

    A.     Stay this matter as requested in the accompanying motion;

    B.     Allow the Defendant to supplement the record in this matter as described

therein;

    C.     Allow discovery by way of a deposition of trial counsel;

    D.     Hold an evidentiary hearing;

    E.     Vacate the Defendant's sentence and order that she have a new trial;

    F.     Grant such other and further relief as justice requires.


Respectfully submitted,

Lisa Biron
By and through her counsel,


/s/Charles J. Keefe
Charles J. Keefe (N.H. Bar No. 14209)
Wilson, Bush, Durkin & Keefe, P.C.
184 Main Street, Suite 222
Nashua, NH 03060
(603) 595-0007
keefe@wbdklaw.com


**Certificate of Service**

I, Charles J. Keefe, hereby certify that on March 23, 2016, true copies of the above document were hand delivered to AUSA Seth Aframe of the United States Attorney's Office for the District of New Hampshire.


/s/Charles J. Keefe

Charles J. Keefe